**Elizabeth K. Crosson (CA # 262178)**
Law Offices of Elizabeth Crosson
252 Ruth Avenue
Venice, CA 90291
(541) 944-5589
Email: lizcrosson@gmail.com

LOCAL COUNSEL

**David H. Becker (OSB # 081507)** Pro Hac Vice Pending
Law Office of David H. Becker, LLC
917 SW Oak Street, Suite 409
Portland, OR 97205
(503) 525-0193
Email: davebeckerlaw@gmail.com

LEAD COUNSEL

**Erin Madden (OSB # 04468)** Pro Hac Vice Pending
Cascadia Law P.C.
2716 SE 23rd Avenue
Portland, OR 97214
(503) 753-1310
Fax: (503) 296-2973
Email: erin.madden@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **KLAMATH SISKIYOU WILDLANDS CENTER and KLAMATH FOREST ALLIANCE,** | Civ. Case No. _____ |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **PATRICIA GRANTHAM**, Forest Supervisor, Klamath National Forest, **KEN HARRIS**, | (National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act) |

COMPLAINT - 1

District Ranger, Happy Camp/Oak Knoll Ranger
District, Klamath National Forest, and
**U.S. FOREST SERVICE**,

        Defendants.

---

### NATURE OF ACTION

1.      Plaintiffs challenge the decision by Federal Defendants to authorize livestock grazing and associated activities on three allotments on the Happy Camp/Oak Knoll Ranger District of the Klamath National Forest through the Oak Knoll Range Project ("Oak Knoll Project"). Continued livestock grazing on these allotments will cause chronic and irreversible damage to sensitive plant and wildlife habitat, seeps, springs, wetlands and other natural resources. Plaintiffs seek declaratory and injunctive relief from the December 29, 2010 Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") approving the Oak Knoll Project. Plaintiffs are entitled to the relief requested in this Complaint to redress the ongoing and threatened injuries to their members' aesthetic, conservation, recreational, scientific, educational and other interests.

2.      This is a civil action for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706. The claims arise from Defendants' violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370(d), and its implementing regulations, 40 C.F.R. § 1500 *et seq.* and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* and the relevant implementing regulations, 36 C.F.R. §§ 219.1-219.36 (2000). This action is brought pursuant to the right of review provision of the APA, 5 U.S.C. § 702.

3.      The Oak Knoll Project authorizes livestock grazing in Northern California and Southern Oregon along the Siskiyou Crest, an area of incomparable biological diversity at the

heart of the Klamath-Siskiyou ecoregion. The area contains unique biologically significant high elevation meadows and other riparian areas set aside as riparian reserves to protect aquatic resources. Livestock grazing damages soils and sensitive plant species in wet meadows, damages riparian areas as livestock trample stream banks and strip streamside vegetation, and degrades water quality by widening stream banks, simplifying aquatic complexity, increasing sedimentation and adding urine and feces to the water. Chronic violations of livestock grazing permits have occurred for several decades. Livestock within the Oak Knoll Project have unlawfully trespassed over the Siskiyou Crest and onto the Rogue River-Siskiyou National Forest since at least the early 1990s.

4.     Despite recognizing the environmental significance of chronic trespass and resource damage on the Rogue River-Siskiyou National Forest from grazing on the Klamath National Forest, the United States Forest Service ("Forest Service") has authorized renewed grazing on the same allotments without addressing the pervasive permit violations, without disclosing the extent of the proposed action and environmental impact, and without preparing the necessary environmental impact statement ("EIS"), in violation of NEPA.  Furthermore, by authorizing the Oak Knoll Project without adequately evaluating the suitability of these lands for grazing, without surveying and monitoring for and ensuring the viability of management indicator species, Sensitive species, and Survey and Manage species and without evaluating and insuring implementation of the objectives and standards of the Northwest Forest Plan's Aquatic Conservation Strategy, the Forest Service is acting inconsistently with direction in the Klamath National Forest Land and Resource Management Plan ("Klamath Forest Plan"), in violation of NFMA.

5.     Because the Forest Service has violated NEPA and NFMA, Plaintiffs seek

declaratory and injunctive relief from this Court.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States, including NEPA, 42 U.S.C. § 4321 *et seq*., NFMA, 16 U.S.C. § 1600 *et seq*., the APA, 5 U.S.C. § 701 *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701–06.

7.      Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, including the decision by the District Ranger in Happy Camp, California, and the denial of the appeal by the Forest Supervisor in Yreka, California, Defendants reside in this district, and the public lands and resources at issue are located in this district.

8.      The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

9.      Plaintiff KLAMATH SISKIYOU WILDLANDS CENTER ("KS Wild") is a non-profit corporation organized under the laws of the State of Oregon. KS Wild is a 501(c)(3) tax exempt, public interest conservation organization based in Williams, Oregon and Ashland, Oregon. KS Wild's organizational mission is to conserve the outstanding biological diversity of the Klamath-Siskiyou region in Southern Oregon and Northern California. KS Wild is a leader in protecting California's national forests and routinely participates in commenting, monitoring, and litigation affecting public lands in California, including the Klamath National Forest. KS

Wild and its staff and members seek to protect the biological health and ecological resources of the region by protecting and preserving the native habitat and hydrologic health of the Klamath-Siskiyou ecoregion. KS Wild staff and members regularly use and enjoy public lands in the Oak Knoll Project area in the Klamath National Forest and adjacent lands in the Rogue River-Siskiyou National Forest impacted by the cattle from these allotments for recreational, aesthetic, conservation, scientific and educational purposes, and will continue to use this area for these purposes in the future. KS Wild has participated in management decisions concerning the Oak Knoll Project and sought protections for sensitive species located there, and will continue to do so in the future. Livestock grazing on the allotments covered by the Oak Knoll Project that degrades the resources and biological diversity there and on adjacent public lands impairs the use and enjoyment of the public lands in that area by KS Wild staff and members.

10.     Plaintiff KLAMATH FOREST ALLIANCE ("KFA") is a non-profit grassroots community organization based in the center of the Klamath-Siskiyou bioregion in Orleans, California. KFA's mission is to promote sustainable ecosystems and sustainable communities and its goal is to defend and protect the biodiversity, wildlife, waters and old growth forests in these wild and rugged watersheds. Since 1989, KFA has a history of vigilance in ensuring that management agencies adhere to laws that safeguard the outstanding values of our public lands while working in collaboration with local Forest Service land managers, Native Tribes, regional allies and local communities. KFA staff and members use and enjoy the Oak Knoll Project area and adjacent lands in the Rogue River-Siskiyou National Forest impacted by the cattle from these allotments for hiking, nature and wildlife viewing and studying, photography, spiritual renewal, solitude, and other recreational, educational, aesthetic, and spiritual purposes, and will continue to use and enjoy the allotment in the future.  Livestock grazing on these high elevation

public lands that violates the law and harms native species and their habitat impairs KFA's goal of protecting biodiversity as well as KFA's staff and members' use and enjoyment of the project area and adjacent lands.

11.     Plaintiffs' interests have been and will continue to be directly harmed by Defendants' actions as challenged herein.  Unless the relief prayed for herein is granted, Plaintiffs as well as the public will continue to suffer irreparable harm and injury to their interests.

12.     Defendant PATRICIA GRANTHAM is sued solely in her official capacity as Klamath National Forest Supervisor. The Forest Supervisor is one of the officials legally responsible for administering NEPA and NFMA and has delegated authority for carrying out the Secretary of Agriculture's ("Secretary") responsibilities under NEPA and NFMA. Ms. GRANTHAM signed the appeal resolution letter denying the appeal filed by KS Wild and KFA on the Oak Knoll Project.

13.     Defendant KEN HARRIS is sued solely in his official capacity as District Ranger of the Happy Camp/Oak Knoll Ranger District, Klamath National Forest. The District Ranger is one of the officials legally responsible for administering NEPA and NFMA and has delegated authority for carrying out the Secretary's responsibilities under NEPA and NFMA. Mr. Harris signed the DN and FONSI authorizing livestock grazing on the East Beaver, Ash Creek and Hornbrook allotments under the Oak Knoll Project.

14.     Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States, under the U.S. Department of Agriculture, and is statutorily charged with managing the National Forest lands at issue here and complying with NEPA and NFMA.

## LEGAL BACKGROUND

### National Environmental Policy Act

15.     Congress enacted NEPA, 42 U.S.C. §§ 4321-4370(d), in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action, and (2) to insure that the public has sufficient information to challenge the agency's action.

16.     The Forest Service is required under NEPA to prepare an environmental impact statement ("EIS") for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

17.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 et seq.

18.     The regulations implementing NEPA require the Forest Service to disclose and analyze the environmental effects of the proposed action 40 C.F.R. § 1500.1(b). Specifically, the regulation explains that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*.

19.     In order to adequately assess the environmental impacts of a proposed action, the Forest Service must assess three types of actions: 1) connected actions; 2) cumulative actions; and 3) similar actions. 40 C.F.R. § 1508.25.

20.     Connected actions are actions that "are closely related and therefore should be discussed in the same impact statement. Actions are connected if they: (i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25.

21.     Cumulative actions are those actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25.

22.     Similar actions are those actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement." 40 C.F.R. § 1508.25.

23.     In addition to analyzing three types of actions, the NEPA regulations require the Forest Service to assess three types of environmental effects: 1) direct effects; 2) indirect effects; and 3) cumulative effects. 40 C.F.R. § 1502.25(c).

24.     Direct effects are those effects that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

25.     Indirect effects are effects that "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

26.     Cumulative effects are the impacts "on the environment which results from the

COMPLAINT - 8

incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

27.     An agency may prepare an environmental assessment ("EA") to evaluate whether an EIS is required. 40 C.F.R. §§ 1501.3–1501.4. An agency may issue a finding of no significant impact, or "FONSI," only where the proposed action will not have a significant effect on the human environment and an EIS is therefore not required. 40 C.F.R. § 1508.13.

28.     In preparing an EA or EIS, NEPA requires the agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 102(2)(E).

29.     Alternatives to the agency's proposed action are "the heart of the environmental impact statement," and the Forest Service must "rigorously explore and objectively evaluate all reasonable alternatives" including "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. §§ 1502.14(a), (c). This requirement applies to preparation of an EA.

**National Forest Management Act**

30.     In 1976, Congress enacted NFMA, 16 U.S.C. §§ 1600–1614, which governs the United States Forest Service's management of the national forests.

31.     NFMA establishes a two-step process for forest planning. NFMA first requires the Forest Service to develop, maintain, and revise "land and resource management plans" ("LRMPs" or "Forest Plans") for each national forest. *Id*. § 1604(a); *see also* 36 C.F.R. § 219.10(a), (b) (2000). Forest Plans guide natural resource management activities forest-wide,

COMPLAINT - 9

setting standards, management area goals and objectives, and monitoring and evaluation requirements.

32.     The Klamath Forest Plan, adopted in 1995, governs the management of public lands on the Klamath National Forest.

33.     Implementation of a Forest Plan occurs at the site-specific level—that is, once a Forest Plan is in place, site-specific actions, such as issuance of a federal grazing permit, are assessed by the Forest Service in the second step of the forest planning process.

34.     Site-specific decisions must be consistent with the broader Forest Plan. 16 U.S.C. § 1604(i).

35.     NFMA also requires the Forest Service to provide animal and plant diversity in the national forests. 16 U.S.C. § 1604(g)(3)(B). Forest Service NFMA regulations adopted in 1982 and in place at the time the Forest Service adopted the Klamath Forest Plan (often referred to as the "1982 Planning Regulations") require the Forest Service to manage forests for viable populations of native vertebrate and desired non-native species. 36 C.F.R. § 219.19 (2000). To ensure that viable populations are maintained on the national forest, the Forest Service regulations require that the agency identify management indicator species ("MIS") and that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat change determined." 36 C.F.R. § 219.19(a)(6) (2000). Further, the regulations state "each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction." *Id*. § 219.12(d) (2000). To ensure biological diversity, the regulations specifically require that "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." *Id*. § 219.26 (2000). These regulatory requirements were incorporated in the Klamath

COMPLAINT - 10

Forest Plan. NFMA also requires the Forest Service to identify the suitability of lands for resource management. 16 U.S.C. § 1604(g)(2)(A); 36 C.F.R. §§ 219.3, 219.26 (2009).

36.     In 2000, the Forest Service replaced the 1982 regulations with new regulations. Federal litigation followed. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003). While that litigation was pending, the Forest Service withdrew the contested regulations. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 567 F.3d 1128, 1130 (9th Cir. 2009). In 2008, the Forest Service issued new regulations, which were subsequently invalidated. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F. Supp. 2d 968 (N.D. Cal. 2009). The district court allowed the Forest Service to choose to reinstate either the 2000 regulations or the 1982 regulations while it prepared new regulations. *Id*. at 982. The Forest Service chose to reinstate the 2000 planning rule. Therefore the agency also must consider the best available science when authorizing activities on National Forest lands, 36 C.F.R. § 219.35(a) (2009), and determine the suitability of an area for grazing before authorizing grazing, 36 C.F.R. § 219.26 (2009), and otherwise comply with the 2000 planning rule.

37.     The Forest Service Handbook and Forest Service Manual provide additional direction on Range Management, including requirements for enforcing permit violations such as unauthorized use. Provisions of the Handbook and Manual have been incorporated into the Klamath Forest Plan. Authorization of grazing under the Oak Knoll Project must be consistent with this management direction.

### Northwest Forest Plan

38.     In 1994, the Forest Service and the Bureau of Land Management issued a Record of Decision for the Northwest Forest Plan ("NFP"). Relevant to this action, the NFP directs management of national forests within the range of the northern spotted owl.

39.     The NFP amended the Klamath National Forest Land and Resource Management

Plan in 1994.

40.     The NFP established four basic land allocations that the Klamath LRMP has

incorporated: (1) Late-Successional Reserves; (2) Adaptive Management Areas; (3) Riparian

Reserves; and (4) Matrix.

41.     Each land allocation is governed by a different set of Standards and Guidelines.

42.     Some NFP Standards and Guidelines apply to all land allocations.

43.     In addition to the land allocations created by the NFP:

The Aquatic Conservation Strategy was developed to restore and maintain the ecological
health of watersheds and aquatic ecosystems contained within them on public lands. The
strategy would protect salmon and steelhead habitat on federal lands managed by the
Forest Service and Bureau of Land Management within the range of Pacific Ocean
anadromy.

This conservation strategy employs several tactics to approach the goal of maintaining
the "natural" disturbance regime. Land use activities need to be limited or excluded in
those parts of the watershed prone to instability. The distribution of land use activities,
such as timber harvest or roads, must minimize increases in peak streamflows. Headwater
riparian areas need to be protected, so that when debris slides and flows occur they
contain coarse woody debris and boulders necessary for creating habitat farther
downstream. Riparian areas along larger channels need protection to limit bank erosion,
ensure an adequate and continuous supply of coarse woody debris to channels, and
provide shade and microclimate protection. Watersheds currently containing the best
habitat or those with the greatest potential for recovery should receive increased
protection and receive highest priority for restoration programs. (NFP, B-9).

44.     The NFP explains that "the standards and guidelines are designed to focus the

review of proposed and certain existing projects to determine compatibility with the Aquatic

Conservation Strategy objectives" (NFP, B-10).

45.     The nine Aquatic Conservation Strategy Objectives ("ACSOs") are:

1.  Maintain and restore the distribution, diversity, and complexity of watershed
    and landscape-scale features to ensure protection of the aquatic systems to
    which species, populations and communities are uniquely adapted.

COMPLAINT - 12

2. Maintain and restore spatial and temporal connectivity within and between watersheds.  Lateral, longitudinal, and drainage network connections include floodplains, wetlands, upslope areas, headwater tributaries, and intact refugia. These network connections must provide chemically and physically unobstructed routes to areas critical for fulfilling life history requirements of aquatic and riparian-dependent species.

3. Maintain and restore the physical integrity of the aquatic system, including shorelines, banks, and bottom configurations.

4. Maintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems. Water quality must remain within the range that maintains the biological, physical, and chemical integrity of the system and benefits survival, growth, reproduction, and migration of individuals composing aquatic and riparian communities.

5. Maintain and restore the sediment regime under which aquatic ecosystems evolved. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport.

6. Maintain and restore in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats and to retain patterns of sediment, nutrient, and wood routing. The timing, magnitude, duration, and spatial distribution of peak, high, and low flows must be protected.

7. Maintain and restore the timing, variability, and duration of floodplain inundation and water table elevation in meadows and wetlands.

8. Maintain and restore the species composition and structural diversity of plant communities in riparian areas and wetlands to provide adequate summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank erosion, and channel migration and to supply amounts and distributions of coarse woody debris sufficient to sustain physical complexity and stability.

9. Maintain and restore habitat to support well-distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species.

(NFP, B-11).

46.     "Management actions that do not maintain the existing condition or lead to improved conditions in the long term would not "meet" the intent of the Aquatic Conservation Strategy and thus, should not be implemented." (NFP, B-10).

COMPLAINT - 13

47.     In addition to the nine ACSOs, the NFP's Aquatic Conservation Strategy includes four prongs: 1) Riparian Reserves; 2) Key Watersheds; 3) Watershed Analysis; and 4) Watershed Restoration (NFP, B-12).

48.     The Riparian Reserve land use allocation is designated on those "portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply.  Standards and guidelines prohibit and regulate activities in Riparian Reserves that retard or prevent attainment of the Aquatic Conservation Strategy objectives…Riparian Reserves occur at the margins of standing and flowing water, intermittent stream channels and ephemeral ponds, and wetlands," and "generally parallel the stream network but also include other areas necessary for maintaining hydrologic, geomorphic, and ecologic processes." (NFP, B-12 to B-13).

49.     The NWF also requires compliance with standards for grazing management:

GM-1. Adjust grazing practices to eliminate impacts that retard or prevent attainment of Aquatic Conservation Strategy objectives. If adjusting practices is not effective, eliminate grazing.

GM-2. Locate new livestock handling and/or management facilities outside Riparian Reserves. For existing livestock handling facilities inside the Riparian Reserve, ensure that Aquatic Conservation Strategy objectives are met. Where these objectives cannot be met, require relocation or removal of such facilities.

GM-3. Limit livestock trailing, bedding, watering, loading, and other handling efforts to those areas and times that will ensure Aquatic Conservation Strategy objectives are met.

50.     The Oak Knoll Project authorizes livestock grazing on 21,986 acres of Riparian Reserves on the East Beaver, Ash Creek and Hornbrook Allotments.

**The Administrative Procedure Act**

51.     The Administrative Procedure Act ("APA") confers a right of judicial review on any person adversely affected by agency action.  5 U.S.C. §702. Upon review, the court shall

"hold unlawful and set aside agency actions…found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. §706(2).

## STATEMENT OF FACTS

**The Klamath National Forest and Rogue River-Siskiyou National Forest**

52.     According to the Forest Service, "the Klamath National Forest encompasses nearly 1.7 million acres of land straddling the California and Oregon border.  The Forest is divided into two sections separated by the Shasta Valley and the Interstate Highway 5 corridor.  In the mountains to the west, the terrain is steep and rugged while the east side has the relatively gentler, rolling terrain of volcanic origin.  With elevations ranging from 450 to 8,900 feet above sea level, the Forest is one of America's most biologically diverse regions, situated in a transitional region between the hotter and drier areas of the south and the colder and wetter locale of the north."

53.     The Klamath National Forest has a varied geology, with substantial areas of serpentine and marble, and a climate characterized by moderately cold winters with very heavy snowfall, and warm very dry summers with limited rainfall.

54.     Researchers have noted that as a consequence of the geology, the mountains harbor a unique floristic region known as the Klamath-Siskiyou, which includes several endemic or near-endemic trees, such as Port Orford cedar (*Chamaecyparis lawsoniana*), Foxtail pine (*Pinus balfouriana spp. balfouriana*), Brewer spruce (*Picea breweriana*) and a small shrub Kalmiopsis (*Kalmiopsis leachiana*), forming one of the largest collections of diverse conifers in the world. The area is also home to a diverse array of wild fish, bird and animal species, including nine species of salmonid, plus bears, large cats, and eagles.

55.     The Happy Camp/Oak Knoll Ranger District is located in northern California and

southern Oregon within the Klamath National Forest. Within this District, the East Beaver

Allotment (66,062 total acres) straddles the Oregon-California border with the northwest border

of the allotment lying along the Siskiyou Crest. The Ash Creek (8,802 total acres) and

Hornbrook (8,780 total acres) Allotments lie east and south of the East Beaver Allotment. The

three allotments lie approximately 8 miles northwest of Yreka, California.

56.     The elevation in the Oak Knoll Project area ranges from 1,700 feet at the

confluence of Beaver Creek and the Klamath River to the south to 7,149 feet at Siskiyou Peak in

the north. The iconic Pacific Crest Trail runs along the northwest border of the East Beaver

Allotment.

57.     The Oak Knoll Project area sits on the southeastern flank of the Siskiyou Crest,

with Mt. Ashland, McDonald Peak and Big Red Mountain forming the northern boundary. Along

with spectacular recreational values, the area is a unique ecological transition zone. Rare plants

and animals inhabit the project area, including Henderson's horkelia, Howell's tauschia and the

Pacific fisher.

58.     The Oak Knoll Project area contains four watersheds which are tributaries to the

Middle Klamath River. The Klamath River and its tributaries have been listed as water quality

impaired under the Clean Water Act § 303(d), 33 U.S.C. § 1313 (listed for nutrients, dissolved

oxygen, temperature, and microcystin). Project area streams contain species, including Coho

salmon, Chinook salmon and Steelhead trout, which are listed as Threatened or Endangered

under the Endangered Species Act and designated by the Forest Service as Sensitive species, as

well as designated critical habitat for these species.

59.     The project area is dominated by forests of primarily mixed conifer at the lower

elevations and mostly true fir above about 5,000 feet. Mixed stands include Douglas-fir,

ponderosa pine, sugar pine, white fir, and incense-cedar. Southern exposures at lower elevations support stands of shrubs or oak. Historically, mature forests in this area were fairly open and dominated by Douglas-fir and ponderosa pine. Over the past 80 years, plant communities have shifted toward more shade-tolerant species, with more white fir and Douglas-fir than previously existed. Many stands are denser and exhibit overstocking and decreased growth rates than occurred historically.

60.     The higher elevations contain extensive meadows dominated by a mix of native and non-native grasses and forbs. There are also large barren areas with exposed soil (about 250 acres total) which are sparsely vegetated with low growing, early successional plants. Because of the minimal amount of ground cover, these sites have higher than average erosion rates. Forage areas for livestock are located in meadows, grasslands, barrens, open sub-ridges, and glacial valley bottoms occurring as patches within the forest mosaic.

61.     Livestock grazing in meadows, streams, riparian areas, and other areas of wet soil has caused significant damage to the soils and vegetation and altered the hydrology of the wetlands. Cattle in riparian areas trample and consume aquatic and terrestrial plant species. Cattle walking on wet soils create depressions in the soil with their hooves and compaction of soils. Such a situation dries out the soil and creates less permeability for water infiltration, decreasing the meadows' ability to absorb water and altering the hydrology of the entire wetland. In addition to damaging soils and diminishing the water table, cattle grazing and trampling these unique areas also damages the riparian plants and vegetation that exist there, as well as the wildlife that depends on this vegetation and water. Consumption and trampling result in the reduction of plant species which are intolerant of cattle-induced disturbance and an increase in the populations of plant species that are tolerant of the disturbance. Livestock grazing also harms

water quality by introducing sedimentation from hooves shearing stream banks, livestock urine and feces deposited directly in streams or as runoff from adjacent riparian areas, and reducing cooling streamside vegetation to stubble, resulting in higher water temperatures.

62.     The Rogue River-Siskiyou National Forest covers approximately 1.8 million acres in southern Oregon and northern California. Lands on the Rogue River-Siskiyou National Forest containing protected riparian reserves, late successional reserves, inventoried roadless areas and other sensitive lands and species lie adjacent to the East Beaver Allotment of the Klamath National Forest where grazing is authorized under the Oak Knoll Project. Unique ecological and recreational values, including high elevation wetlands and upland plant communities in the McDonald Basin, Monogram Lakes and McDonald Peak Botanical Area occur adjacent to the East Beaver Allotment. Unauthorized grazing has been and continues to impact these resources.

63.     Livestock grazing on the East Beaver Allotment have frequently and unlawfully trespassed from the Klamath National Forest onto the Rogue River-Siskiyou National Forest, with reported violations dating back to the early 1990s. The two Forests have previously adopted strategies intended to address this trespass. These strategies have been unsuccessful. The Klamath National Forest has issued no notices of violation, taken no permit action to correct these violations, and has not reduced the number of livestock or season of use allowed despite these permit violations. The Klamath National Forest has not acted consistent with the direction of the Forest Service Manual and Forest Service Handbook in failing to enforce the permits. These chronic permit violations have caused and will continue to cause resource damage, loss of biological diversity, impaired water quality, and adverse impacts to recreational resources on the Rogue River-Siskiyou National Forest.

64.     The Forest Service identifies cattle trespass from the East Beaver Allotment, over

the Siskiyou Crest, and onto the Rogue River-Siskiyou National Forest in violation of the

Klamath National Forest grazing permits as a "significant issue" for the Oak Knoll Project.

**The Oak Knoll Project**

65.     Annual livestock use on the East Beaver Allotment since the late 1970s has been

fairly steady at approximately 1,218 head months. Two permittees graze on four pasture units

within the allotment.

66.     Annual livestock use on the Ash Creek Allotment was 267 head months prior to

the Oak Knoll Project, with one permittee grazing one pasture unit.

67.     Annual livestock use on the Hornbrook Allotment was 130 head months prior to

the Oak Knoll Project, with one permittee grazing one pasture unit.

68.     Livestock grazing has occurred on all three allotments since at least 1905. The

three allotments in the Oak Knoll Project cover approximately 84,644 acres (including

approximately 48,422 acres of National Forest lands). Management indicator species, including

steelhead and rainbow trout, Cascades frog, Tailed frog, American dipper, Northern water shrew,

and Long-tailed vole, and Forest Service Sensitive species, including Willow flycatcher, Yellow-

Legged Frog, and Cascades Frog, occur or have suitable habitat on these three allotments.

69.     On November 20, 2009, the Forest Service issued a scoping notice for an EA on

the proposal to authorize livestock grazing through term permits for ten years within the East

Beaver, Ash Creek and Hornbrook Allotments, implement an adaptive management system, and

build two small corrals. KS Wild and KFA submitted scoping comments on the Oak Knoll

Project on December 24, 2009.

70.     On July 13, 2010, the Forest Service published an announcement of availability of

the EA for the Oak Knoll Project. KS Wild and KFA submitted comments on the EA on August

COMPLAINT - 19

10, 2010 and August 13, 2010. Members of both groups submitted comments during the public comment period on the EA.

71.     On December 29, 2010, the Forest Service issued a DN and FONSI, authorizing livestock grazing on 48,422 acres of national forest land within the East Beaver, Ash Creek and Hornbrook Allotments. The DN also includes implements an adaptive management system ("AMS") for all three allotments, and authorizes construction of two small corrals to assist with livestock management within the East Beaver Allotment under the Oak Knoll Project. Legal notice publication of the DN/FONSI was January 3, 2011.

72.     The proposed action and selected alternative would authorize grazing in the East Beaver Allotment under a Term Grazing Permit and authorize the Hornbrook and Ash Creek Allotments under a Term Permit With On and Off Provisions. The EA, DN and FONSI do not describe the number of cow/calf pairs nor the season of use that would be authorized under the proposed action or selected alternative.

73.     The EA, DN and FONSI fail to disclose or quantify the ecological impacts of decades of livestock trespass onto the Rogue River-Siskiyou National Forest as required under NEPA, nor explain why livestock trespass, determined to be a significant issue, should not be evaluated in an EIS. The EA, DN and FONSI also do not provide a reasoned explanation of why other significant impacts of livestock grazing, including impacts to water quality, sensitive plants and wildlife, and Riparian Reserves should not be evaluated in an EIS. The EA, DN and FONSI do not disclose the Forest Service's range management direction in the Forest Service Manual and Forest Service Handbook and how the Klamath National Forest has failed to comply with that direction and the consequent environmental impacts of that failure.

74.     The EA, DN and FONSI do not provide a reasoned basis for the Forest Service's

conclusion that approximately 3,385 acres are suitable for supporting livestock grazing or for the

Forest Service's authorization of grazing on 48,422 acres of National Forest lands when it

determined that only 7% of the total allotment acreage (84,644 acres) was suitable for grazing.

Notably, only 998 acres are identified as "primary range" on the three allotments in the EA.

75.     The Forest Service did not survey and monitor for management indicator species,

Sensitive species, or Survey and Manage species in the Oak Knoll Project area, did not evaluate

the effect of trespass grazing from the Oak Knoll Project allotments on these species on the

adjacent lands of the Rogue River-Siskiyou National Forest, and did provide an assurance of the

viability of these species in authorizing livestock grazing under the project or evaluate the effect

of the project on these species.

76.     The Forest Service did not evaluate or insure implementation of the NFP's

Aquatic Conservation Strategy, evaluate and insure compliance with Aquatic Conservation

Strategy objectives, or evaluate and insure compliance with grazing standards under the NFP.

77.     On February 3, 2011, KS Wild and KFA appealed the DN on the Oak Knoll

Project. On March 25, 2011, the Forest Supervisor denied the appeal in its entirety.

78.     KS Wild and KFA have exhausted their administrative remedies.

## FIRST CLAIM FOR RELIEF

### NEPA VIOLATION

79.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

80.     This first claim for relief challenges the Forest Service's violations of the National

Environmental Policy Act, 43 U.S.C. § 4321 et seq., and NEPA's implementing regulations, in

authorizing grazing, term permits, and associated activities under the Oak Knoll Project.

81.     NEPA requires federal agencies to undertake a thorough and public analysis of

COMPLAINT - 21

the environmental consequences of proposed federal actions by completing an Environmental

Impact Statement or Environmental Assessment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.

An agency can exclude an activity from NEPA review only if it has determined that the activity

falls within a category of actions which do not individually or cumulative have a significant

effect on the environment. 40 C.F.R. §§ 1501.4, 1504.8.  The Forest Service's violations of

NEPA include, but are not limited to:

  A.  Failing to prepare an EIS despite the probability that the proposed action may

result in significant effects to the human environment;

  B.  Failing to disclose high quality and accurate information to the public, including

failing to provide information about the planned intensity (numbers and season of use) of

livestock grazing, impacts to resources protected by the ACSOs, the effects of trespass by

livestock from the Oak Knoll Project allotments on the Rogue River-Siskiyou National Forest,

and the inconsistency of past range management and the Oak Knoll Project with the direction in

the Forest Service Manual and Forest Service Handbook;

  C.  Failing to conduct surveys for management indicator species, Sensitive species,

and Survey and Manage species and disclose data on the presence of such species to the public;

  D.  Failing to evaluate direct, indirect and cumulative impacts of the proposed action

and connected and cumulative actions;

  E.  Failing to consider reasonable alternatives;

  F.  Failing to explain how the Forest Service will ensure that proposed mitigation

measures designed to limit significant impacts actually will be implemented, whether the Forest

Service has sufficient resources to implement proposed mitigation and monitoring commitments,

whether or how monitoring effectiveness will be measured, and how the agency will remedy

COMPLAINT - 22

mitigation failure or non-implementation;

G.      Failing to consider important factors, including but not limited to evaluating the suitability of the public lands for livestock grazing, impacts to water quality and aquatic function, effects of the proposed action on Coho salmon and other salmonids listed as Threatened under the Endangered Species Act, and public and private lands and resources adjacent to the three Oak Knoll Project allotments, and to take a "hard look" at the environmental impacts of the proposed action.

82.      This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

83.      These violations of NEPA are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

## SECOND CLAIM FOR RELIEF

### NFMA VIOLATION

84.      Plaintiffs reallege and incorporate by reference the preceding paragraphs.

85.      This second claim for relief challenges the Forest Service's violations of the National Forest Management Act, 16 U.S.C. § 1600 et seq., and NFMA's implementing regulations, in authorizing grazing, term permits, and associated activities under the Oak Knoll Project.

86.      Under NFMA, the Forest Service must act consistently with direction in the applicable land management plan when authorizing any project or activity. 16 U.S.C. § 1604(i). It also must consider the best available science when authorizing activities on National Forest lands, 36 C.F.R. § 219.35(a) (2009), and determine the suitability of an area for grazing before

COMPLAINT - 23

authorizing grazing, 36 C.F.R. § 219.26 (2009). The Forest Service's violations of NFMA include, but are not limited to:

A.      Acting inconsistently with direction in the Klamath Forest Plan, NFMA and the implementing regulations by failing to determine the suitability of the public lands covered by the Oak Knoll Project for livestock grazing and whether proposed grazing would be compatible with desired conditions and objectives and maximize long-term net public benefits;

B.      Acting inconsistently with direction in the Klamath Forest Plan, NFMA and the implementing regulations by authorizing grazing on thousands of acres of national forest land not determined to be suitable for grazing in the LRMP;

C.      Acting inconsistently with direction in the Klamath Forest Plan, Northwest Forest Plan, NFMA and the implementing regulations by failing to survey and monitor for management indicator species, Sensitive species, and Survey and Manage species, and failing to insure the viability of those species, and failing to consider the impacts of grazing on other wildlife;

D.      Acting inconsistently with direction in the Klamath Forest Plan, Northwest Forest Plan, NFMA and the implementing regulations by failing to implement the Aquatic Conservation Strategy, failing to evaluate and insure compliance with Aquatic Conservation Strategy objectives, failing to evaluate and insure compliance with grazing standards under the Northwest Forest Plan, and failing to consider the best available science;.

87.      This claim is brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 706(2).

88.      These violations of NFMA are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

**PRAYER FOR RELIEF**

A.      Adjudge and declare that the Forest Service's authorization of livestock grazing, term permits, and related activities under the Oak Knoll Project violate NEPA, NFMA, and their implementing regulations, and thus are arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.      Adjudge and declare that the Klamath National Forest's DN/FONSI and EA for the Oak Knoll Project and the associated term grazing permits are insufficient as a matter of law and order the Forest Service to withdraw the DN/FONSI and EA and the associated term grazing permits until such time as the agency demonstrates it has complied with the law;

C.      Order the Forest Service to comply with the requirements of NEPA and NFMA before issuing further permits or other grazing authorizations for the East Beaver, Ash Creek and Hornbrook Allotments or allowing further grazing on these allotments;

D.      Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

E.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq. and all other applicable authorities; and

F.      Grant such further relief as the Court deems just and proper in order to provide Plaintiffs with relief and protect the public interest.

Respectfully submitted this 17th day of June 2011.

/s/ Liz Crosson
Liz Crosson (CA # 262178)
252 Ruth Ave
Venice, CA 90291
(541) 944-5589
lizcrosson@gmail.com

LOCAL COUNSEL

David H. Becker (OSB # 081507)
          Pro Hac Vice Pending
Law Office of David H. Becker, LLC
917 SW Oak Street, Suite 409
Portland, OR 97205
(503) 525-0193
Email: davebeckerlaw@gmail.com

LEAD COUNSEL

Erin Madden (OSB # 04468)
          Pro Hac Vice Pending
Cascadia Law P.C.
2716 SE 23rd Avenue
Portland, OR 97214
(503) 753-1310
Fax: (503) 296-2973
Email: erin.madden@gmail.com

Attorneys for Plaintiffs

COMPLAINT - 26