1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   KLAMATH SISKIYOU WILDLANDS                No.  2:11-cv-01647 MCE-CMK
     CENTER and KLAMATH FOREST
12   ALLIANCE,

13              Plaintiffs,                     **MEMORANDUM AND ORDER**

14        v.

15   PATRICIA GRANTHAM, Forest
     Supervisor, Klamath National Forest,
16   KEN HARRIS, District Ranger, Happy
     Camp/Oak Knoll Ranger District,
17   Klamath National Forest, and U.S.
     FOREST SERVICE,
18
                Defendants.
19

20

21        Through the present action, Plaintiffs Klamath Siskiyou Wildlands Center and the

22   Klamath Forest Alliance (hereinafter collectively referred to as "Plaintiffs" unless

23   otherwise indicated) seek to establish that the Klamath National Forest has violated both

24   the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4231, et seq., and the

25   National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1600, et seq., in

26   authorizing livestock grazing under the so-called Oak Knoll Range Project.

27   ///

28   ///

                                              1

1   Plaintiffs now move for summary judgment on grounds that said claims present no

2   genuine dispute of material fact, and that Plaintiffs are accordingly entitled to judgment

3   as a matter of law in accordance with Rule 56 of the Federal Rules of Civil Procedure.[1]

4   Defendants, in opposition to Plaintiffs' motion, have filed a cross motion for summary

5   judgment on their own behalf alleging that the Forest Service's re-authorization of

6   livestock grazing in the site-specific Oak Knoll Range Project ("the Project") in fact

7   complied with the terms of both NEPA and the NFMA.  Defendants contend that the

8   Forest Service's decision not to prepare a full Environmental Impact Statement for the

9   project was therefore proper.

10

11   **BACKGROUND**

12

13   The parties agree that grazing along the Siskiyou Crest, which divides the

14   Klamath National Forest ("KNF") on the south and the Rogue River-Siskiyou National

15   Forest ("RRSNF") on the north, has been authorized for well over a century.  Plaintiffs

16   nonetheless assert that the Siskiyou Crest, which straddles the California-Oregon

17   border, is an area of incredible biological diversity containing the largest concentration of

18   intact watersheds and roadless areas remaining in the Pacific Northwest.  According to

19   Plaintiffs, the area's high elevation meadows and riparian areas host hundreds of

20   different rare and sensitive plant and animal species.

21   As Defendants point out, however, Congress has long expressly allowed  grazing

22   as a permissible use of forest lands, even in designated wilderness areas.  The Multiple-

23   Use Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528-531, establishes a policy

24   of using national forests for a variety of purposes, including grazing.  Id. at § 528.

25   Similarly, the NFMA also directs that a multiple-use approach to land use be adopted.

26   16 U.S.C. § 1604(e)(1).

27

28   [1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise indicated.

2

1    In addition to these broad statutory directives, the Land and Resource Management Plan

2    ("LRMP") for the KNF itself expressly authorizes grazing within the KNF, stating that

3    vegetation is to be managed "to provide for healthy ecosystems and to make forage

4    available on a sustainable basis for use by livestock, wildlife, and wild horses."

5    Administrative Record for the Oak Knoll Range Project ("AR") 5233.[2]  The KNF points

6    out that the Standards and Guidelines for range use include the preparation of

7    environmental analyses for grazing allotments under NEPA and the provision of yearly

8    management direction to grazing permittees, along with species protection and

9    utilization guidelines in various kinds of range conditions.  AR 5281-85.

10           The area encompassed by the Project at issue in this lawsuit contains three

11   different grazing areas (the so-called East Beaver, Ash Creek and Hornbrook allotments)

12   that in total comprise some 84,644 acres, only some 48,423 acres of which are actually

13   located on National Forest System lands.  AR 259.  About 80 percent of the allotment

14   area is located in Siskiyou County, California, with the remaining 20 percent situated in

15   Jackson County, Oregon.  The Environmental Assessment  ("EA") prepared for the

16   Project, however, determined that despite this sizeable area (all of which is situated

17   along the southern side of the Siskiyou Crest), only some 3,855 acres of the National

18   Forest property was actually suitable for grazing purposes on a sustained basis.  See AR

19   259, 282-83.

20           Because of the lack of natural barriers along the Siskiyou Ridge and due to the

21   impracticality of maintaining fences along the vast border, both sides agree that there

22   has been a history of permitted livestock from both the KNF and the RRSN "drifting" from

23   allotments in one forest to the other.  See, e.g., AR 3541-42, 4273.  The parties further

24   concede that both the KNF and the RRSNF have worked over the years to address

25   livestock drift and the potential it poses for excess use of various grazing allotments.

26   ///

27           [2] While the Bates numbering system used for the AR employs an additional prefix OK ("OKAR"),
     all references herein shall simply be to "AR," with additional references to the Supplemental Administrative

28   Record designated as "SAR."

3

1    To that end, both forests formulated the so-called Siskiyou Crest Rangeland

2    Management Strategy ("SCRMS") as a means of systematically addressing the issue.

3    The SCRMS was first implemented in 1994 and efforts to refine the policy continue to

4    the present.  According to KNF, with the refinement of this joint management strategy

5    over the years, the numbers drift has steadily decreased, with an average less than 60

6    KNF cows being reported on the RRSNF during recent years.  See, e.g., AR 3230-32,

7    3217-20, 3360, 3331-37, 3344-59, SAR 104-118; see also Second Declaration of

8    Stephanie M. McMorris, ¶ 10.

9        According to the KNF, the Project was developed to meet the need to continue

10   authorized livestock grazing, and to ensure NEPA compliance on the East Beaver, Ash

11   Creek and Hornbrook allotments it encompasses.  In proposing the Project, the KNF

12   recognized public demand from qualified livestock operators for continued livestock

13   grazing in these allotments.  AR 265.  Only two permittees are authorized to graze cattle

14   on the East Beaver allotment, and the remaining two allotments allow a single permittee.

15   AR 263-64.  Currently, one permittee holds permits to graze on all three allotments, and

16   a second permittee is authorized to use the East Beaver allotment.  AR 1222-24.  Both

17   individuals have held permits for their respective allotments since the 1970s and 1980s.

18       The Project at issue herein permits continued livestock grazing on the three

19   allotments in question for a period of ten years.  The 106-page EA analyzing the project

20   was circulated for public comment in July of 2010.   The EA identified cattle drift onto the

21   RRSNF as a "significant issue" for consideration.  AR 266.  In order to address that

22   concern, the EA outlines an Adaptive Management Strategy ("AMS") to be implemented

23   for all three allotments.  The proposed AMS is designed to improve trends in rangeland

24   vegetation condition, stream condition, and forage utilization through the use of

25   monitoring and, if necessary, corrective management actions.  AR 165-66.  In addition,

26   two sets of corrals are envisioned for the assistance of livestock management on the

27   East Beaver allotment.  Id.

28   ///

4

In the event that initial measures are insufficient, other management actions (like building drift fences, using a full time rider, or decreased permitted livestock numbers) are envisioned until desired utilization conditions are reached.  AR 276, 248.

The Project EA further incorporated the Siskiyou Crest Rangeland Management Strategy ("SCRMS"), as modified by both forests in May of 2010, as a means to collect information on the frequency and duration of KNF permitted cattle.  The SCRMS required that vegetation utilization monitoring be performed annually in areas of the RRSNJ most subject to KNF cattle drift, and further required monitoring throughout the grazing season to identify drift cattle by both Forest Service personnel and KNF grazing permittees.  Those permittees were required under the SCRMS to check and remove wayward KNF livestock at least every seven days, and to take appropriate corrective action within three days with respect to drift-prone animals by way of culling or removal.  Failure to adhere to these monitoring guidelines would subject permittees to escalating administrative actions, including potential suspension of grazing privileges as necessary.  AR 4462, 276, 356-57.

The EA looked at three other alternatives to address cattle drift in addition to the proposed action.  Those alternatives included fencing along the Siskiyou Crest (rejected as prohibitively expensive), establishing a common grazing allotment between the two forests (rejected because planning and permitting cycles did not coincide and would not eliminate drift into RRSNF areas closed to grazing in any event) and excluding livestock altogether from the northern portion of the KNF allotments (rejected because most of suitable rangeland and forage was located near the Crest, and because limiting cattle to the lower part of the allotments would not be feasible in any event without cost-prohibitive fencing).  AR 278-79.

Scoping letters were initially issued for the Project in December of 2009.  AR 265-66.  The RRSNF responded by requesting only that a statement about the impacts of cattle drift to their permittees be included in the analysis.  AR 791, 786.  A statement to that effect was included in the October 2010 EA Addendum and Amendment.  AR 248.

1   After considering the comments received, the KNF issued a Decision Notice and Finding

2   of No Significant Impact ("FONSI")  on December 29, 2010.  AR 164-230.  The Project

3   was thereafter upheld on administrative appeal on March 25, 2011.  AR 1, 8.  The

4   present lawsuit challenges that decision.

5        Plaintiffs argue that unauthorized livestock drift from KNF allotments on the south

6   side of the Crest to the lusher northern slopes of the RRNF has been, and continues to

7   be, a problem ever since grazing began to be permitted.  Plaintiffs contend that wayward

8   cattle trample fragile meadow and riparian ecosystems, strip vegetation from stream

9   banks and damage pristine plant habitat.  Plaintiffs contend that the number of

10  trespassing animals has not improved in recent years as the EA suggests.  They argue

11  that continued drift, and the resulting trampling and displacement of soil, could lead to

12  the listing of a rare plant, Tauschia howellii (a perennial forb in the carrot family), under

13  the Endangered Species Act, citing an 1996 EA prepared by the RRSNF for its Wagner

14  Butte Allotment on the northern side of the Siskiyou Crest.   SAR 68, 70.  Plaintiffs

15  further cite data indicating that cattle trespass in another area of the RRSNF, the

16  McDonald Basin, has resulted in "streambank trampling, soil compaction and reduction

17  in streamside vegetation," along with downcut and widened channels, increased, runoff,

18  increased sediment production, increased deposition rates downstream and altered

19  species composition and structure of riparian vegetation."  SAR 68.  According to

20  Plaintiffs, the RRSNF has restricted its own grazing use in its Wagner Allotment due to

21  KNF cattle trespass.  AR 745.  Despite these ongoing effects, Plaintiffs claim that the

22  KNF "has failed time and again" to take sufficient action to curtail unauthorized grazing

23  despite repeated requests from the RRSNF that it do so.

24

25                          **PROCEDURAL FRAMEWORK**

26

27        Congress enacted NEPA in 1969 to protect the environment by requiring certain

28  procedural safeguards before an agency takes action affecting the environment.

1  The NEPA process is designed to "ensure that the agency ... will have detailed

2  information concerning significant environmental impacts; it also guarantees that the

3  relevant information will be made available to the larger [public] audience." Blue

4  Mountains Biodiversity Project v. Blackwood, 171 F.3d 1208, 121 (9th Cir. 1998).  The

5  purpose of NEPA is to "ensure a process, not to ensure any result." Id.  "NEPA

6  emphasizes the importance of coherent and comprehensive up-front environmental

7  analysis to ensure informed decision-making to the end that the agency will not act on

8  incomplete information, only to regret its decision after is it too late to correct." Center

9  for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003).

10  Complete analysis under NEPA also assures that the public has sufficient information to

11  challenge the agency's decision.  Robertson v. Methow Valley Citizens, 490 U.S. 332,

12  349 (1989); Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1151 (9th Cir. 1998).

13     NEPA requires that all federal agencies, including the Forest Service, prepare a

14  "detailed statement" that discusses the environmental ramifications, and alternatives, to

15  all "major Federal Actions significantly affecting the quality of the human environment."

16  42 U.S.C. § 4332(2)(c).  An agency must take a "hard look" at the consequences,

17  environmental impacts, and adverse environmental effects of a proposed action within

18  an environmental impact statement ("EIS"), when required.  Kleppe v. Sierra Club,

19  427 U.S. 390, 410 n.21 (1976).  To determine whether an EIS is prepared, an agency

20  may first prepare an environmental assessment ("EA").  The objection of an EA is to

21  "[b]riefly provide sufficient evidence and analysis to determine whether to prepare" an

22  EIS.  40 C.F.R. § 1508.9(a)(1).  If the EA indicates that the federal action may

23  significantly affect the quality of the human environment, the agency must prepare an

24  EIS.  40 C.F.R. § 1501.4; 42 U.S.C. § 4332(2)(C).

25     In the event an agency determines that an EIS is not required, it must, as the KNF

26  did here, issue a Finding of No Significant Impact ("FONSI") detailing why the proposed

27  action "will not have a significant effect on the human environment."

28

1   40 C.F.R. § 1508.13.   The EA must support the agency's position that a FONSI is

2   indicated.  Blue Mountains, 161 F.3d at 1214.

3        Given its status as a statutory scheme safeguarding procedure rather than

4   substance, NEPA does not mandate that an EIS be based on a particular scientific

5   methodology, nor does it require a reviewing court to weigh conflicting scientific data.

6   Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th Cir. 1985).  An

7   agency must be permitted discretion in relying on the reasonable opinions of its own

8   qualified experts, even if the court might find contrary views more persuasive. See, e.g.,

9   Kleppe, 427 U.S. at 420, n. 21.  NEPA does not allow an agency to rely on the

10  conclusions and opinions of its staff, however, without providing both supporting analysis

11  and data.  Idaho Sporting Cong., 137 F.3d at 1150.  Credible scientific evidence that

12  contraindicates a proposed action must be evaluated and disclosed.  40 C.F.R.

13  § 1502.9(b).

14        In addition to arguing that the Forest Service violated NEPA in this case,

15  Plaintiffs also contend that the Oak Knoll Range Project violates the National Forestry

16  Management Act ("NFMA"), 16 U.S.C. § 1600, et seq., which provides for substantive,

17  as opposed to procedural, protection for actions that affect the environment.  The NFMA

18  requires that "resource plans and permits, contracts, and other instruments for the use

19  and occupancy of National Forest Systems lands shall be consistent with the land

20  management plans."  16 U.S.C. § 1604(i).   Forest planning and management under

21  NFMA and its implementing regulations occurs at two levels:  the forest level and the

22  individual, site-specific project level.  See generally 16 U.S.C. § 1604; see also Ohio

23  Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 729-30 (1998).   At the forest level the

24  Forest Service Develops a Land and Resources Management Plan ("LMRP" or Forest

25  Plan),  which is a broad, long-term planning document for an entire National Forest.

26  LRMPs establish planning goals and objectives for units of the National Forest Service

27  for management of forest resources, ensuing consideration of both economic and

28  environmental factors.  16 U.S.C. § 1604(g)(1)-(3).

1    At the project level, site-specific actions must be consistent with the operative LRMP.

2    See Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 757 (9th Cir.

3    1996); Idaho Conservation League v. Mumma, 956 F.2d 1508, 1511-12 (9th Cir. 1992);

4    see generally 16 U.S.C. § 1604(i).

5            Once a Forest Plan is approved, then the Forest the Forest Service implements

6    it by approving or denying site-specific projects, like the Oak Knoll Range Project at

7    issue herein.  Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1092 (9th Cir.

8    2003).  "In order to ensure compliance with the forest plan and the [NFMA], the Forest

9    Service must conduct an analysis of each "site specific' action to ensure that the action

10   is consistent with the forest plan."  Native Ecosystems Council v. U.S. Forest Serv.,

11   418 F.3d 953, 960 (9th Cir. 2005) (quoting Idaho Sporting Cong., 305 F.3d at 962).  All

12   activities in Forest Service forests, then, must be consistent with the governing forest

13   plan, which is a broad, programmatic planning document.  See, e.g., Wilderness

14   Society v. Thomas, 188 F.3d 1130, 1132 (9th Cir. 1989).  If an EA or EIS adequately

15   discloses the effects of such activities, NFMA's goal is satisfied.  Inland Empire Pub.

16   Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996).

17           Because neither NEPA nor NFMA contain provisions allowing a private right of

18   action (see Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990) and Ecology

19   Center Inc. v. United States, 192 F.3d 922, 924 (9th Cir. 1999) for this proposition under

20   NEPA and NFMA, respectively), a party can obtain judicial review of alleged violations of

21   NEPA or NFMA only under the waiver of sovereign immunity contained within the

22   Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  Earth Island Institute v.

23   U.S. Forest Serv., 351 F.3d 1291, 1300 (9th Cir. 2005).

24           Under the APA, the court must determine whether, based on a review of the

25   agency's administrative record, agency action was "arbitrary and capricious," outside the

26   scope of the agency's statutory authority, or otherwise not in accordance with the law.

27   Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994).

28   Review under the APA is "searching and careful."

1  Ocean Advocates, 361 F.3d at 1118.   However, the court may not substitute its own

2  judgment for that of the agency.  Id. (citing Citizens to Preserve Overton Park, Inc. v.

3  Volpe, 401 U.S. 402 (1971), overruled on other grounds by Califano v. Sanders,

4  430 U.S. 99 (1977)).

5       In reviewing an agency's actions, then, the standard to be employed is decidedly

6  deferential to the agency's expertise.  Salmon River, 32 F.3d at 1356.  Although the

7  scope of review for agency action is accordingly limited, such action is not

8  unimpeachable.  The reviewing court must determine whether there is a rational

9  connection between the facts and resulting judgment so as to support the agency's

10  determination.  Baltimore Gas and Elec. v. NRDC, 462 U.S. 87, 105-06 (1983), citing

11  Bowman Trans. Inc. v. Arkansas-Best Freight Sys. Inc., 419 U.S. 281, 285-86 (1974).

12  An agency's review is arbitrary and capricious if it fails to consider important aspects of

13  the issues before it, if it supports its decisions with explanations contrary to the evidence,

14  or if its decision is either inherently implausible or contrary to governing law.  The Lands

15  Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005).  In other words, there must be "a

16  clear error of judgment."  League of Wilderness Defenders v. U.S. Forest Serv., 549 F.3d

17  1211, 1215 (9th Cir. 2006).   The plaintiffs bear the burden of proof in making the

18  requisite showing in that regard.  Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

19

20                                             **STANDARD**

21

22       Summary judgment is an appropriate procedure in reviewing agency decisions

23  under the dictates of the APA.  See, e.g., Northwest Motorcycle Assn. v. U.S. Dept. of

24  Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994).  Under Federal Rule of Civil Procedure 56,

25  summary judgment may accordingly be had where, viewing the evidence and the

26  inferences arising therefrom in favor of the nonmovant, there are no genuine issues of

27  material fact in dispute."  Id. at 1472.

28  ///

In cases involving agency action, however, the court's task is governed by the judicial review provisions of the APA, which requires a court to hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2); Native Ecosystems Council, 418 F.3d at 960.   A decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor  Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.Co., 463 U.S. 29, 43 (1983).   In reviewing an agency decision, the court must be "searching and careful" in ensuring that the agency has taken a "hard look" at the environmental consequences of its proposed action.  Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846, 858-59 (9th Cir. 2005);  Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).  An agency must articulate a rational connection between the facts found and the conclusions made.  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).

**ANALYSIS**

As an initial matter, it is important to view the Oak Knoll Range Project in proper perspective.  The Project envisions the same level of grazing activities that have been permitted for decades.  Additionally, as indicated above, the same two  permittees who have grazed the land since the 1970s and 1980s continue to hold the same grazing permits for the three KNF parcels at issue in this litigation.  The extent of the grazing permitted also has to be considered.  Contrary to Plaintiffs' assertion, the Project EA does contain information about maximum stocking levels and seasonal usage.

///

///

1    The Rangeland Specialist Report prepared in connection with the Project, and

2    incorporated within the EA, shows that on the East Beaver Allotment a total of 32 cow-

3    calf pairs are permitted during the Spring season from April 1 through June 15.

4    Thereafter, during the summer months, those numbers increase to 188.  AR 1222.  A

5    single permittee, Edward Lemos, is responsible for all the East Beaver spring grazing

6    and 156 of the pairs allotted for the summer months.  The remaining East Beaver

7    permittee, Harvey Hagedorn, has only a 32-head quota for the June 15 to October 31

8    summer season.  The numbers for the other two grazing allotments at Ash Creek and

9    Hornbrook are much lower.  Mr. Lemos is the sole permittee and the maximum allowable

10   number is 89 for Ash Creek and 10 for Hornbrook for a period of only two months, from

11   April 15 to June 15.  These totals, as reported in the Rangeland Specialist Report, are

12   also reiterated within the body of the Project EA itself.  See AR 263-64, 278.

13        Given the fact that the three allotments encompass a total of nearly 50,000 acres,

14   the number of grazing animals, which is never contemplated at exceeding more than

15   188 pair at any time during the year, is relatively small.  That conclusion remains valid

16   even if one considers the 3,855 acres within the Forest Service allotments that has been

17   deemed actually suitable for grazing purposes.  AR 1221-24.

18        The present case revolves primarily on the even more limited question of how

19   many of the relatively few KNF authorized livestock drift onto adjacent RRSNF

20   allotments, and the extent to which those wayward animals consequently impact RRSNF

21   resources.  There is no question that the EA treats this unauthorized drift, however

22   minimal, as a "significant issue" for consideration.  AR 266.  Ultimately, as indicated

23   above, the KNF, by issuing a FONSI, found that the project did not have the potential to

24   cause significant environmental effects so as to merit preparation of a full EIS.

25        An EA, by definition, need not include the same level of detail, and the same

26   depth of response to pertinent concerns, as a full EIS.  See Cal. Trout v. FERC,

27   572 F.3d 1003, 1016 (9th Cir. 2009).

28   ///

1   Under 40 C.F.R. § 1508.9, an EA is defined as a "concise public document … that

2   serves to briefly provide sufficient evidence and analysis for determining whether to

3   prepare an environmental impact statement or a finding of no significant impact."   An

4   agency must go farther and substantially prepare a full EIS only "if substantial questions

5   are raised as to whether a project may cause significant degradation of some human

6   environmental factor."   LaFlamme v. FERC, 852 F.2d 389, 397 (9th Cir. 1988).  Here, as

7   indicated above, after considering the impacts of the proposed action within a lengthy,

8   106-page EA that included separate Specialist Reports addressing issues pertaining to

9   Rangeland (AR 1209), Botany (AR 911), Fisheries (AR 1135, 1034), Geological

10   Resources (AR 1172), Soils (AR 1294), and Water Resources (AR 1332), the KNF

11   determined that the significant environmental impact needed to trigger preparation of a

12   full EIS was lacking.

13

14   **A.  The EA's "Hard Look" at the Project Satisfies NEPA**

15

16          Plaintiffs contend that the Project runs counter to the provisions of NEPA because

17   it does not adequately analyze environmental effects posed by grazing livestock on the

18   rangeland itself, on soils and water quality concerns and, perhaps, most significantly, for

19   purposes of the present matter, on adjacent rangeland parcels in the RRSNF.  Plaintiffs

20   assert that no adequate qualitative or quantitative data is included which sufficiently

21   analyzes the effects of the drifting animals on RRSNF resources.

22          Turning first to the drift issue, as stated above, Plaintiffs are wrong in indicating

23   that the EA does not set parameters for stocking rates and for the grazing season, since

24   both the Rangeland Specialist Report and the EA itself include the pertinent numbers.  In

25   addition, the KNF has over the years asked the RRSNF to provide quantitative data with

26   respect to impacts and resource damage from cattle drift.  See, e.g., AR 764-66, 4274,

27   4390-91.  RRSNF provided copies of EAs prepared for its grazing allotments along the

28   Skskiyou Crest, namely, for the Glade Creek and Wagner Butte areas.

1  AR 757, SAR 33-77.  Those documents, from 1996 and 1997, respectively, identified as

2  "substantial" (see SAR 45) but did not otherwise quantify the extent of drift into the

3  allotments.[3]  Plaintiffs nonetheless take the KNF to task for not generating data that the

4  forest directly impacted failed to provide.

5      Given the fact that cattle drift by definition would be difficult to numerically pinpoint

6  in a large and remote area like the Siskiyou Crest, this lack of data is not surprising.

7  Nonetheless, the record is replete with evidence of monitoring effort and resulting

8  livestock drift sightings.  Those sightings appear for the most part to have been both

9  relatively elusive and small in number.  See AR 3231-32, 3217-20, 3360, 3331-37, 3344-

10  59, SAR 104-118.  That data does not lend itself well to the development of hard

11  quantitative figures, as attested by the lack of such numbers in EAs prepared by both

12  forests.  Although Plaintiffs cast aspersions on KNF disclosure motives by pointing to

13  meeting notes indicating that "[w]e need to be careful with how to include the Rogue and

14  the drift issue" (AR 810), such statements are also not surprising given the difficult-to-

15  pinpoint nature of the problem itself.

16      Turning from quantitative to qualitative data, the EA did consider various

17  qualitative information in the course of the NEPA process and acknowledged that

18  information.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27  [3] The fact that the Wagner Creek EA contained passing reference to a Plant Biological Evaluation and a Botanical Resource Report that Plaintiffs now claim may contain some quantitative data is of no import when those documents were not provided to KNF, despite its request for any information on

28  impacts and resource damage from cattle drift.

14

1    See, e.g., AR 280 (identifying cattle drift outside the KNF allotments as a significant

2    issue due to the level of public interest and documented history of cattle straying across

3    allotment boundaries); AR 293 (stating that soil disturbance associated with cattle drift

4    outside the allotments at issue would be eliminated or reduced under selected

5    alternative); AR 248 (stating that cattle that drift onto the RRSNF use forage in areas that

6    would otherwise be available to RRSNF permittees which may contribute to

7    overutilization);  AR 351 (SCRMS describing drift issue and undesirable utilization

8    levels); AR 745-47 (RRSNF email containing qualitative information about cattle drift on

9    the RRSNF; SAR 104-118 (cattle drift summaries for 2007-09 with photos).

10    Overall, the Project EA discloses sufficient information about cattle drift.  The EA

11    devotes an entire section to drift.  In addition, the 2010 SCRMS, which is incorporated

12    within the EA (AR 280), includes a detailed and historical discussion of the cattle drift

13    issue, a description of the area, past and recent strategies, ideas and alternatives to

14    reduce drift over the years, monitoring information, and the action plan for addressing

15    cattle drift that will be adopted and implemented through the AMS, including grazing

16    permit guidelines.  AR 351-60.   Finally, the Rangeland Specialist Report, also

17    incorporated by reference into the EA (at AR 281) assesses cattle drift onto the RRSNF

18    for each alternative and discusses and discloses the cattle drift issue.  See AR 1211-12,

19    1238-39, 1245-46.  As Defendants point out, despite clear evidence of some drift, there

20    is "no quantitative, objective, measurable evidence or data in the record to establish that

21    the RRSNF has actually incurred substantial resource damage that is definitively linked

22    to cattle grazing and, more specifically, to grazing by KNF cattle."  Defs.' Mot., 28:2-4,

23    emphasis in original.[4]

24    ///

25    ///

26    _____

[4] While Plaintiffs argue that overgrazing may impact the viability of a rare plant species, Tauschia
27    howellii, the Botany Specialist Report indicates that the plant is found near the top of Siskiyou Peak in an
area not used by cattle and inhospitable to animals.  AR 932.  The Report further indicates that the
species has been monitored every five years since the 1980s, and that there has been "no observed
28    impact from cattle to the Tauschia site over the years."  AR 924, 932.

1    The information that Plaintiffs do provide, as evidenced most prominently in the

2    Declaration of Gregory Clevenger, a retired Forest Resource Staff Officer for the

3    RRSNF, is primarily anecdotal and based on personal as opposed to scientific

4    observation.

5        Plaintiffs also argue that the Project's mitigation features violate NEPA because

6    they are little more than perfunctory and do not demonstrate the likely effectiveness of

7    the proposed features.  NEPA, however, "do[es] not force agencies to make detailed,

8    unchangeable mitigation plans…"  Theodore Roosevelt Conservation Partnership v.

9    Salazar, 616 F.3d 497, 517 (D.C. Cir. 2010).  Instead, as Defendants point out, "NEPA

10   specifically allows agencies to use adaptive management plans that… monitor the real

11   environmental effects of a project and allow the [agency] to adapt its mitigation

12   measures in response to the trends observed."  Western Watersheds Project v. Bureau

13   of Land Mgt., 2011 WL 1630789 at *3 (D. Nev. 2011).

14       The EA here proposes an adaptive management strategy much like that

15   recognized by the Western Watersheds court.  An adaptive management system

16   ("AMS") is proposed for all three grazing allotments, and a set of corrals to assist with

17   livestock drift is envisioned for the East Beaver Allotment, which accounts for the vast

18   majority of grazing and is presumably responsible for most of the drifting that does occur.

19   AR 166, 268-69.  The AMS "is designed to improve trends in rangeland vegetation

20   condition, stream condition, and forage utilization through the use of monitoring, and if

21   determined necessary, corrective management actions."  AR 166.  The monitoring

22   strategy encompassed by AMS is two pronged.  First, the "implementation" component

23   consists of range readiness, utilization and so-called Multiple Indicator Monitoring

24   ("MIM").

25   ///

26   ///

27   ///

28   ///

1   As the EA explains:

2           Implementation monitoring will be used annually in key areas
            to determine range readiness and utilization levels.  The key
3           areas are places that reflect adverse environmental
            conditions or trends much earlier than other portions of a
4           grazing unit.  When soil and forage conditions in those areas
            are satisfactory, the entire unit can be considered
5           satisfactory. Implementation monitoring will be performed
            prior to grazing for range readiness determination and during
6           the grazing season for utilization level determination.

7   AR 274.  The EA goes on to describe the range readiness monitoring and utilization

8   monitoring to be implemented in some detail at AR 273-74 and goes on to explain

9   multiple indicator monitoring as

10          A method that provides an efficient and effective approach to
            monitoring streambanks, stream channels, and riparian
11          vegetation.  MIM will be conducted both during
            implementation and effectiveness monitoring.  This
12          monitoring procedure will be used at Designated Monitoring
            Areas (DMAs) to help evaluate livestock grazing
13          management to determine whether the vegetation and
            stream channels are responding as anticipated, and whether
14          or not the ACS is being met.

15  AR 274.  The EA describes MIM procedures that will be used to measure and record

16  streambank stability, vegetation composition and trend, woody species use, and channel

17  width/depths.  All those measurements are designed to help the Forest Service

18  determine if the grazing management strategies are in fact achieving the so-called

19  Aquatic Conservation Strategy ("ACS").  Id.

20          The second monitoring component, so-called "effectiveness" monitoring, is

21  envisioned by the EA as an aid in determining rangeland health as well as ecological

22  conditions and trends in key areas within the key East Beaver allotment.  Id.  It is

23  designed to include rooted frequency vegetation sampling every five years to determine

24  plant species composition at nine permanent plot points in the East Beaver Allotment.

25  Effectiveness monitoring also encompasses a Best Management Practices Evaluation

26  Program ("BMPEP") intended to evaluate how well the Forest and the Region implement

27  Best Management Practices ("BMPs") and how effectively they control water pollution

28  from National Forest lands.  Id. at 274-75.

17

1    BMPS to be implemented for the Project, as outlined in Appendix C to the EA, include

2    BMP 7.8 (Cumulative Off-Site Watershed Effects), BMP 8.1 (Range Analysis and

3    Planning), BMP 8.2 (Grazing Permit System), and BMP 8.3 (Rangeland Improvements).

4    AR 349-50.  MIM will also be conducted as part of effectiveness monitoring.  AR 274-75.

5        Effectiveness training will further include cattle drift monitoring under the 2010

6    SCRMS to collect information on the frequency and duration of KNF cattle drifting into

7    the RRSNF.  Such monitoring, according to the EA, will include annually in the

8    McDonald Baskin, Siskiyou Gap, and Glade Creek areas of the RRSNF.  Id. at 275.

9    Moreover, as already indicated above, the Project EA both summarizes the 2010

10    SCRMS at AR 276 and includes a complete copy of the protocol at Exhibit D.  AR 351-

11    59.

12        Defendants argue that these mitigation measures "constitute an adequate buffer

13    against the negative impacts that may result from the authorized activity."  Nat'l Parks

14    and Conservation Ass'n v. Babbitt ("NPCA"), 241 F.3d 722, 734. (9th Cir. 2001).

15    Plaintiffs' argument that the mitigation measures outlined above lack analytical data

16    appear to rest on the belief that the AMS proposed provides a procedural framework for

17    moving forward and analyzing effects as they occur (and taking action accordingly),  as

18    opposed to making determinations on the basis of analytical data, and baseline

19    conditions, already present.  Plaintiffs also contend that more drastic mitigation

20    measures are warranted because similar mitigation measures in the past, particularly

21    with respect to the proposed SCRMS.  Plaintiffs also contend that failure of the KNF to

22    enforce grazing terms by taking action against permittees with drifting cattle mitigates

23    against any escalating management action, despite Plaintiffs' claim that non-compliance

24    notices have been necessary because permit holders have taken action to remove cattle

25    whenever such roaming livestock have been identified.

26    ///

27    ///

28    ///

1    Given the evolving and flexible AMS that the EA outlines, as outlined above, the

2   Court rejects Plaintiffs' contention that the Project's mitigation analysis is perfunctory and

3   non-compliant with NEPA's guidelines that the Project and its effects be carefully

4   considered through the requisite "hard look."  NEPA requires only that proposed

5   mitigation measures "be developed to a reasonable degree" (NPCA, 241 F.3d at 734),

6   and that the agency provide "a reasonably complete discussion of possible mitigation

7   measures."  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352 (1989).

8   The Project EA here meets those benchmarks.

9    Even if the Court were to accept Plaintiffs' prediction that the efficacy of past

10   measures shows that the current proposal is not apt to work, that alone is not enough to

11   run afoul of NEPA.  As a procedural statute, NEPA's purpose is to ensure that the

12   process of taking a hard look at a proposed action has occurred.  NEPA does not

13   mandate any particular result.  Robertson, 490 U.S. 350.  The Ninth Circuit's decision in

14   Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089 (9th Cir. 2003) is illustrative.

15   Plaintiffs there argued that overgrazing had continued despite the Forest Service's prior

16   remedial efforts.  Because of that prior lack of success, Plaintiffs claimed that the Forest

17   Service's monitoring plan for range management was necessarily arbitrary and

18   capricious.   The Ninth Circuit disagreed.  Citing the high level of deference accorded

19   agency decisions, the court found that the agency's past history did not condemn its

20   future continuing efforts, particularly since continued monitoring appears to be the only

21   rational way to effectively predict grazing use.  Id. at 1099.

22    In sum, it must be underscored that grazing in the allotments in question, and

23   some drift into neighboring parcels due to terrain and climatic conditions, has continued

24   for decades and in some cases back to the nineteenth century.  There is little evidence

25   of quantitative, objectively verifiable damage to RRSNF resources due to wayward KNF

26   cattle, a finding not particularly surprising given the relatively low grazing rates on the

27   three large KNF allotments at issue.

28   ///

1    The present Project, which authorizes ten continued years of grazing activity, is little

2    different than its predecessor with the exception of more rigorous and sophisticated

3    monitoring measures designed to trigger escalating management action against permit

4    holders should grazing overutilization be found to occur.  In this Court's estimation, the

5    Project's monitoring approach is a sensible one under the circumstances and its EA

6    does not violate NEPA.  Its flexibility allows the Forest Service to assess both direct

7    effects and cumulative impacts as they develop.

8

9    **B.  The Oak Knoll Project Does Not Violate NFMA**

10

11          Under NFMA, the KNF must act consistently with its Forest Plan when making

12   decisions authorizing activities like grazing.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.10.

13   Plaintiffs argue that the Project violates NFMA on two grounds.  First, they contend that

14   the grazing it proposes fails to comply with the Forest Plan's Aquatic Conservation

15   Strategy ("ACS").   Second, Plaintiffs contend that by authorizing grazing on non-suitable

16   lands the Project also fails to pass muster under NFMA.  Defendants, on the other hand,

17   argue that the Project is not arbitrary and capricious because it does comply with the

18   Forest Plan.

19          1.  ACS Objectives.  KNF's Forest Plan requires that grazing practices be

20   adjusted "to eliminate impacts that retard or prevent attainment of [ACS] objectives."  AR

21   5339.  Those objectives include the maintenance/restoration of the aquatic's system's

22   physical integrity such that riparian area and wetland habitat will support well-distributed

23   native plant and animal species.  AR 5231.  In order to establish compliance with said

24   objectives, the KNF must describe the existing conditions of the watersheds within the

25   project area, the natural variability of important physical and biological components, and

26   how the proposed grazing will either maintain existing conditions or move them within

27   the range of natural viability.  See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.,

28   373 F. Supp. 2d 1069, 1093 (E.D. Cal. 2004).

1    As already discussed above, the EA explains how the Forest Service has developed

2    monitoring protocols to ensure compliance with Forest Plan guidelines for ACS

3    compliance.  AR 290, 1356.  Because monitoring protocols will continue under the

4    project and be supplemented with Multiple Indicator Monitoring ("MIM") under the AMS,

5    the EC concludes that ACS objectives are met.  Id.

6         While Plaintiffs complain that MIM has not conducted by KNF in the past, and

7    argue that the BMPEP evaluations relied on by the EA for compliance purposes date

8    from 1998 and 2008, respectively, neither factor establishes NFMA noncompliance.  The

9    2008 BMPEP was for the East Beaver allotment where most of the proposed grazing

10   has and will continue to take place, and that study was prepared only a year before the

11   NEPA process for evaluating the project commenced.  AR 2989-2992.  Moreover, in

12   addition to the aforementioned BMPEP evaluations, utilization monitoring data was also

13   collected by the KNF for its East Beaver Allotment for the period between 1994 and

14   2008.  AR 1340, 2967-69.  Rooted frequency vegetation monitoring to determine plant

15   species composition was also conducted for three long-term key plots (AR 1339, 2993-

16   97) and observations of Cow Creek within the East Beaver Allotment were done by

17   Forest Service soils scientist in 2009.  AR 1340.  Perhaps, more importantly, the Water

18   Resource Specialist Report incorporated within the EA concludes that "existing

19   conditions are compliant with ACS" and that the project should continue to be compliant

20   with ACS because the monitoring protocols will continue and the AMS, including MIM,

21   will be implemented.  AR 1356.  As explained in the EA, "MIM is a method that provides

22   an efficient and effective approach to monitoring streambanks, stream channels, and

23   riparian vegetation."  AR 274.  The EA calls for MIM to be used at Designated Monitoring

24   Areas "to help evaluate livestock grazing management to determine whether the

25   vegetation and stream channels are responding as anticipated, and whether or not the

26   ACS is being met."  Id.

27   ///

28   ///

1    Because the EA and its supporting documents show both how current conditions

2    comply with ACS and how continued compliance is expected by use of additional

3    monitoring strategies, the Court believes that the Project complies with the KNF Plan's

4    ACS requirements and, consequently, does not violate NEPA.

5    2.  Suitability Analysis.   Forest Service regulations require that the KNF

6    determine the suitability of an area before authorizing grazing.  36 C.F.R. § 219.26; see

7    also 16 U.S.C. § 1604(g)(2)(A) (Forest Service must identify "the suitability of lands for

8    resource management").  As the EA observes, that suitability analysis occurs at both the

9    Forest and site-specific levels.  AR 282.  The EA explains how the suitability analysis

10   was made for the Oak Knoll Project, and breaks down available range acreage for each

11   of the three allotments in question.  Id. at 282-83.  The analysis concludes that a total of

12   3,385 acres qualified for commercial grazing on a sustained basis., or about 7 percent of

13   the total allotment acreage on Forest lands within the Project area.  Id. at 283, 179.

14   Essentially, Plaintiffs take issue with the suitability analysis on grounds that grazing is

15   technically allowed on the 48,422 acres of forest land within the allotments, only some

16   7 percent of that figure is actually rangeland suitable.  According to Plaintiffs, that

17   discrepancy makes the suitability determination arbitrary and capricious.

18   Both the EA and the Rangeland Specialist report explains that suitable "[f]orage

19   areas for livestock are located in meadows, grasslands, open sub-ridges and glacial

20   valley bottoms occurring as patches within the forest mosaic."  AR 281, 1218.  Because

21   these grazing areas are necessarily scattered through the allotments, it would appear

22   axiomatic that cattle must be permitted to travel through the allotments in order to access

23   available rangeland.  That accounts for the suitability determination for the allotments as

24   a whole, since it would be all but impossible to limit grazing only to the scattered areas

25   without permitting livestock to move through the allotments in search of those areas.

26   Seen as such, it was not arbitrary and capricious for the KNF to authorize grazing on the

27   allotments in their entirety, and doing so did not violate NFMA.

28   ///

1    **C.  A Full EIS in Not Required**

2

3       A full EIS, as opposed to the more concise EA issued in this case, is required if

4 "the agency's actions <u>may</u> have a significant impact upon the environment."  <u>NPCA</u>,

5 241 F.3d at 730 (emphasis in original).  Whether an action may "significantly" affect the

6 environment "requires consideration of context and intensity."  <u>Center for Biological</u>

7 <u>Diversity v. Nat'l Highway Traffic Safety Admin</u>., 538 F.3d 1172, 1185 (9th Cir. 2008 )

8 (citing 40 C.F.R. § 1508.27).

9       The NEPA regulations outline various factors that must be considered in

10 determining whether a contemplated action poses the requisite significant impact.  <u>Sierra</u>

11 <u>Club v. U.S. Forest Serv</u>., 843 F.2d 1190, 1193 (9th Cir. 1988).  In arguing that a full EIS

12 under the circumstances was required, Plaintiffs point to only three of the delineated

13 factors; namely, the alleged highly controversial effects of the project, the area's unique

14 characteristics, and a claim that the project violates NFMA.   Because the Court has

15 already determined above that no NFMA violation is present, the focus narrows to a

16 consideration of whether the Oak Knoll Range Project was indeed highly controversial,

17 as well as an assessment of the Project area's unique characteristics.

18       1.  <u>Highly Controversial.</u>  A project is deemed "highly controversial" where "a

19 substantial dispute exists as to the size, nature, or effect of the major federal action

20 rather than to the existence of opposition to a use.   <u>Native Ecosystems Council v.</u>

21 <u>United States Forest Service</u>, 428 F.3d 1233, 1240 (9th Cir. 2005) (citing <u>Blue Mountains</u>

22 <u>Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1216 (9th Cir. 1998)).  Here, as

23 Defendants point out, the Oak Knoll Range Project would not appear on its face to

24 qualify as controversial.  The Project authorizes the same level of grazing that has

25 occurred on the three allotments at issue for decades, and the same individuals who

26 have grazed cattle on the land since the 1970s and 1980s continue to be the permit

27 holders.

28 *///*

The main difference between the current Project and previous grazing is that the Oak Knoll EA contains enhanced mitigation measures to ameliorate environmental grazing impacts in general and from cattle drift into adjacent parcels in particular.  Moreover, the proposed Adaptive Management Strategy is designed to permit the Forest Service to monitor impacts and to make adjustments as necessary to ensure that standards and guidelines are met.

In attempting to identify a substantial dispute, Plaintiffs point to the EA's own description of cattle trespass as a "significant issue."  AR 280.  Both Forests, however, readily concede that some drift is taking place, a concession that hardly points in the direction of either substantial dispute or marked controversy.  Additionally, while Plaintiffs Point to the 1996 Wagner Butte EA as evidencing substantial disagreement between the KNF and RRSNF, that study was nearly fifteen years old at the time the Project EA was prepared.  What is far more recent, and more germane to the current state of affairs, is the updated 2010 SCRMS between the two parties, pursuant to which they implemented new measure for dealing with livestock drift which, among other charges, required permittees to drift-prone cattle to check cattle once a week during the grazing season.  AR 356.  KNF staff also agreed in the 2010 protocol to increase their monitoring efforts, and to work together with RRSNF personnel to identify offending cattle and to notify permit holders of the roaming animals within three days.  AR 357.

It also bears noting that RRSNF's March 4, 2010 letter to KNF, while continuing to identify "chronic incidental unauthorized use of KNF permitted livestock" onto RRSNF allotments (AR 745), acknowledges some slow improvement and outlines a total of seven measures to address ongoing drift.  AR 746-47.  The KNF addressed those comments in the NEPA process and incorporated a number of RRSNF's suggestions into the Project.

///

///

///

24

1   Permittees are required, for example, to check for cattle drift every week (AR 3229, SAR

2   82), the KNF now documents visits and communications with permittees and actively

3   searches for excess livestock on the RRSNF while monitoring the Siskiyou Crest (AR

4   3217-3230, 748-50), the KNF engages non-range employees in monitoring for excess

5   use (AR 3240), the EA discusses drift fencing and culling options (AR 276) and the

6   Project specially envisions the construction of corrals to remove problematic animals (AR

7   280).  All these measures were suggested by the RRSNF's March 2010

8   correspondence.  AR 745-47  While the Ninth Circuit, in its <u>Blue Mountains</u> decision, did

9   point to unanswered concerns by a sister forest as demonstrating the inadequacy of a

10   NEPA document (309 F.3d at 1192), this case is inapposite inasmuch as the RRSNF's

11   suggestions were both acknowledged by the KNF and included within the EA.

12       It also bears noting in this regard that Donna Mickley, the District Ranger for the

13   RRSNF's Siskiyou Mountains Ranger District, states that KNS has worked

14   collaboratively with the RRSNF to develop and improve the SCRMS.  Mickley indicates

15   in her declaration that the KNF "has been responsive to potential cases of excess use by

16   removing cattle from the RRSNF when the KNF has noticed instances of excess use or

17   when they have been alerted by the RRSNF personnel."  Mickley Decl., ¶ 4.

18       Perhaps even more significantly, during the NEPA process itself the RRSNF did

19   not raise concerns about resource damage from cattle grazing.  As Defendants point

20   out, nowhere in that process does the RRSNF state that it opposes the project; it offers

21   no challenge to any of KNF's conclusions about the nature, size or effect of the project;

22   and it does not suggest that the EA is insufficient or that the KNF should prepare an EIS.

23   <u>See</u> AR 424, 745-47.

24       Following careful consideration of all the factors outlined above, this Court cannot

25   conclude that the Project was highly controversial and merited a full EIS, as opposed to

26   the more streamlined EA that was prepared, on that basis.

27   ///

28   ///

2.  Unique  Characteristics.   The Forest Service must also consider the "[u]nique characteristics of the geographic area such as proximity to … ecologically critical areas" when making a significant determination with respect to assessing the need for an EIS. Plaintiffs point to the fact that the Siskiyou Crest contains diverse habitats that harbor unique and rare plant species.  They contend that trampling and displacement by grazing cows could pose a threat to those areas, and urge the Court to require the preparation of a comprehensive EIS accordingly.  Plaintiffs place particular emphasis on so-called Howell's Tauschia  (Tauschia howellii), a rare plant species that could be pushed towards listing under the Endangered Species Act if its habitat is disturbed by foraging livestock.

Plaintiffs' position in this regard appears unwarranted.  First, as already indicated, the EA's Botany Specialist Report found that only one Tauschia species was found within the East Beaver Allotment (AR 924) in an area near the top of Siskiyou peak in an area not used by cattle.  AR 932.  The Botany Specialist Report further notes that the species has been monitored every five years since the 1980s in any event, and that there has been "no observed impact from cattle to the Tauschia site over the years."  AR 924, 932.

With respect to the efficacy of mitigation measures, even Plaintiffs concede that adoption of such measures may in some circumstances justify the omission of a full EIS. NPCA, 241 F.3d at 733-34.  As already discussed earlier in this Memorandum and Order, the EA outlines mitigation measures with various monitoring, sampling and observational components.  An EIS is not indicated on the basis of the Project area's unique characteristics either.

///

///

///

///

///

**CONCLUSION**

Based on the foregoing, Defendants' Cross Motion for Summary Judgment (ECF No. 43) is hereby GRANTED.  The Court concludes that the KNF's re-authorization of livestock grazing pursuant to the site-specific Oak Knoll Range Project is in compliance with the terms of both NEPA and the NFMA, and that the Project EA adequately disclosed the effects of the Project.  Plaintiffs' own Motion for Summary Judgment (ECF No. 32) is accordingly DENIED.  The Clerk of Court is directed to enter judgment in Defendants' favor accordingly.

IT IS SO ORDERED.

DATED:  April 8, 2013

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT JUDGE